Filed 9/27/21  P. v. Weimer CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARTIN HAYNES WEIMER,<br><br>Defendant and Appellant. | C090441<br><br>(Super. Ct. No. STKCRFECOD20180008096) |

A jury found defendant Martin Haynes Weimer guilty of residential robbery in concert and first degree residential burglary with a true finding that a nonaccomplice was present in the residence.  On appeal, defendant argues CALCRIM No. 315 wrongly instructs the jury that one of the factors it could consider in assessing the accuracy of eyewitness identifications is the certainty of the witnesses.  He contends this error lowered the prosecution's burden of proof and violated his due process rights to present a defense.  Our Supreme Court recently rejected these identical claims in *People v. Lemcke* (2021) 11 Cal.5th 644.  Defendant also argues his prior prison term enhancements should

1

be stricken pursuant to Senate Bill No. 136. We shall affirm the conviction but strike his prior prison term enhancements.

BACKGROUND

In 2017, victim Greg Alberdi was retired but operating a side business out of his home buying items and selling them on eBay. Alberdi had eight cameras on the outside of his house. He often bought items from a small number of individuals who came to his home, including an individual named Denver Jenkins.

On November 28 around 6:00 p.m., Jenkins arrived to sell items to Alberdi at his home. Alberdi indicated he did not want to buy Jenkins's items, after which Jenkins became irritated and stated, "[s]ome day you'll get yours." Approximately two hours later, Alberdi heard a knock on his door, and upon checking the security camera monitor, saw two white men he did not recognize. When Alberdi did not answer the door, the two men left and returned several times. Alberdi noticed both men were wearing orange knit caps similar to the one Jenkins had been wearing earlier. Alberdi began to believe the shorter of the two men was Jenkins, so he cracked the door open, at which point the two men forced the door fully open, knocking Alberdi down. The taller man got on top of Alberdi and put a knife to his throat, at which point Alberdi got "a good look" at him.

The taller man held Alberdi down while the shorter man went upstairs. When the shorter man came downstairs, Alberdi saw that he had "pillow cases with stuff in them." The shorter man grabbed two display cases with jewelry in them and went out the door. As he was leaving, Alberdi determined the shorter man was not Jenkins because his hair color was different.[1]

After both men had left, Alberdi called 911. Responding officers reviewed the camera footage from the surveillance system with Alberdi. In the subsequent days,

_____

[1] While the surveillance footage showed only two individuals, it was alleged the third individual was the truck driver.

2

Alberdi showed the camera footage to everybody he knew in order to help identify the robbers. One of these individuals was Frank Rayfield, who identified one of the men as Charles Peoples whom he referred to as his "stepbrother." Alberdi and Rayfield found Peoples on Facebook and determined Peoples had the same tattoo as the taller man who held Alberdi at knifepoint.

Officers subsequently conducted surveillance on Peoples by positioning themselves near a levee where Peoples had been staying in an orange tent. As they were getting in position to watch the tent, the officers noticed another individual who looked like the unidentified male from the surveillance images. An officer contacted the individual, who identified himself as defendant.

A few months after the crimes, Peoples's girlfriend, Lavina Barnec met with the police. She agreed to cooperate with the police in exchange for a five-year reduction of Peoples's sentence. She identified Jenkins and defendant in a photographic lineup. At trial, Barnec testified that on the night of the robbery, she met Jenkins and defendant. That evening, around 8:00 p.m., Peoples, Jenkins, and defendant were talking and Peoples told Barnec that the three of them were going to take care of a child molester. Jenkins said, "Let's go do this" and they got into a beat up truck.

Later that evening, Peoples and Jenkins returned to Peoples's tent. Barnec saw that Jenkins had a box with several items, including a cell phone and credit cards, which he threw into the water.

Jenkins testified in his own defense and admitted that on November 28, 2017, around 6:00 p.m., he went to Alberdi's house to sell him some items. Jenkins denied being angry when Alberdi declined to purchase his items. Jenkins denied knowing Peoples, Barnec, or defendant prior to November 28, 2017. He denied going to talk to defendant or Peoples about beating up a child molester at Alberdi's house. He denied meeting Barnec on November 28, 2017, and denied having met Peoples in prison. He claimed he only learned of Peoples and defendant when he was arrested.

3

The prosecutor showed Alberdi and Barnec photos of Jenkins's vehicle, which was a green GMC truck with a camper shell. They both recognized the vehicle as belonging to Jenkins. Further, Steve Newsom, a classification officer for the San Joaquin County Sheriff's Department, testified that in August 2001, Jenkins and Peoples were housed in the same barracks at the jail. For five days, their bunks were three or four feet apart.

During deliberations, the jury requested to review the surveillance video and for a readback of Barnec's identification testimony as well as the investigating detective's testimony.

Defendant was charged with residential burglary and first degree residential robbery in concert. He was also charged with the enhancements of having a prior prison term pursuant to Penal Code section 667.5, subdivision (b), having previously been convicted of a serious felony, as well as enhancements for committing a crime against certain vulnerable persons. The jury found defendant guilty of all charged conduct. Defendant was sentenced to 27 years to life for robbery with the burglary sentence stayed.

DISCUSSION

I

*CALCRIM No. 315*

Defendant contends the trial court erred by instructing the jury with the witness certainty language in CALCRIM No. 315 as the factor of witness certainty is no longer supported by scientific evidence. CALCRIM No. 315, as instructed, provided: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendants before the event; how well could the witness see the perpetrator; what were the circumstances affecting the witness' ability to observe,

4

such as lighting, weather conditions, obstructions, distance, duration of observation; how closely was the witness paying attention; was the witness under stress when he or she made the observation; did the witness give a description and how does that description compare to the defendants; how much time passed between the event and the time when the witness identified the defendants; was the witness asked to pick the perpetrator out of a group; did the witness ever fail to identify the defendants; did the witness ever change his or her mind about the identification; *how certain was the witness when he or she made an identification*; are the witness and the defendant of different races; was the witness able to identify other participants in the crime; was the witness able to identify the defendants in a photographic or physical lineup; were there any other circumstances affecting the witness's ability to make an accurate identification.  [¶]  The People have the burden of proving beyond a reasonable doubt that it was the defendants who committed the crime.  If the People have not met this burden, you must find the defendants not guilty."  (Italics added.)  Defense counsel did not object to this jury instruction in whole or in part.

## A

### *Forfeiture*

The parties first argue whether defendant's arguments concerning the witness certainty language are forfeited because defendant did not raise an objection to CALCRIM No. 315 at trial.  Defendant argues trial counsel had no obligation to object because, at the time of trial, the law provided the CALCRIM No. 315 witness certainty instruction was valid.  As our Supreme Court has explained, a defendant's failure to request a modification of an instruction on eyewitness certainty in the trial court forfeits the ability to challenge the instruction on appeal.  (*People v. Sanchez* (2016) 63 Cal.4th 411, 461-462 [with respect to a challenge to the witness certainty language in the predecessor instruction to CALCRIM No. 315, the defendant's challenge to the inclusion

5

of the certainty language was forfeited because the defendant did not request a modification of the instruction].)

B

*Witness Certainty Instruction*

After briefing was completed in this matter, our Supreme Court issued its opinion in *Lemcke*.  In *Lemcke*, when considering a due process challenge to the witness certainty language in CALCRIM No. 315, our Supreme Court found it significant that the defendant was able to present expert evidence about eyewitness identification, and that the jury was instructed that " '[p]eople sometimes honestly . . . make mistakes about what they remember,' " and that it was responsible for " 'judg[ing] the credibility or believability of the witnesses.' " (*People v. Lemcke*, *supra*, 11 Cal.5th 644 at p. 658.) Further, *Lemcke* noted that in the instruction on eyewitness identification, the jury was instructed that:  " '[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty.' " (*Ibid*.)  In that context, our Supreme Court held "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id.* at p. 661.)[2]

In this matter, witness certainty was not a central issue, and this factor was not addressed by either party or by the witness herself.  Further, the jury was permitted to

---

[2]     Although not relevant to our evaluation of defendant's argument, we note that our Supreme Court in *Lemcke* stated it "believe[s] there is a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy," and it thus "direct[ed] . . . trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*People v. Lemcke*, *supra*, 11 Cal.5th at p. 669.)

review the surveillance video and determine for itself whether it found beyond a reasonable doubt that defendant was the second individual seen on the footage. As in *Lemcke*, witness certainty was one of numerous factors the jury was directed to consider when evaluating witness testimony. The jury was given the specific instructions on witness testimony and the burden of proof that our Supreme Court in *Lemcke* found to be significant in alleviating any due process problem. Accordingly, there is no merit in defendant's contention that his right to due process was violated by the inclusion of language regarding witness certainty in CALCRIM No. 315.

II

*Senate Bill No. 136*

Defendant contends, and the People agree, that recently enacted Senate Bill No. 136, which limits the prior offenses that qualify for a prior prison term enhancement under Penal Code section 667.5, subdivision (b) applies retroactively to his case. We agree with the parties. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Sen. Bill No. 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].) "Senate Bill [No.] 136 amended [Penal Code] section 667.5, subdivision (b) such that a one-year enhancement for a prior prison term shall be imposed only if the prior term was for a sexually violent offense." (*People v. Winn* (2020) 44 Cal.App.5th 859, 872.) Because defendant's prior prison terms were not for sexually violent offenses, his one-year enhancements, which were lawful at the time of sentencing, are now unauthorized. (See *In re Blessing* (1982) 129 Cal.App.3d 1026, 1030; *People v. Harvey* (1980) 112 Cal.App.3d 132, 139.) Accordingly, we will strike these enhancements.

DISPOSITION

We strike the one-year sentences imposed on the prior prison term enhancements pursuant to Penal Code section 667.5, subdivision (b). In all other respects, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment

and to forward a certified copy thereof to the California Department of Corrections and Rehabilitation.

/s/_____
Robie, J.

We concur:

/s/_____
Blease, Acting P. J.

/s/_____
Renner, J.