Filed 10/22/21  P. v. Austin CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TERRELL TRAVON AUSTIN,<br><br>    Defendant and Appellant. | E073184<br><br>(Super.Ct.No. FSB18001197)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and James H. Flaherty, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Terrell Travon Austin was convicted of murder and attempted murder, among other crimes and enhancements.  He raises two contentions on

1

appeal: (1) that the trial court erroneously excluded evidence that the attempted murder victim had once shot himself during a robbery but claimed to police to be a victim; and (2) that the jury should not have been given CALCRIM No. 315, which instructs a jury to consider an eyewitness's degree of certainty, among over a dozen other factors, in evaluating the credibility of that eyewitness's identification. During the pendency of this appeal, our Supreme Court decided *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), which held that the use of CALCRIM No. 315 did not violate the defendant's right to due process on the record before it, even though "trial courts should omit the certainty factor from CALCRIM No. 315" until the Judicial Council of California finished a reevaluation of the instruction. (*Lemcke*, *supra*, 11 Cal.5th at p. 648.)

We reject Austin's contentions and affirm. The trial court did not abuse its discretion in excluding the evidence and, following *Lemcke*, we find no due process violation from the use of CALCRIM No. 315 here.[1]

## I. BACKGROUND

In January 2018, Jermoni Stewart and his friend Jordan Bass were sitting on jet skis parked in the driveway of Bass's mother's house in San Bernardino when two men walked toward them. One of those men threw what Bass believed to be a potential gang sign. Bass, noticing that the two men were pulling out guns, ducked underneath one of the jet skis.

---

[1] Undesignated statutory references are to the Penal Code.

The assailants opened fire. Investigators recovered 13 casings from two guns at the scene. Stewart was struck five times, including twice in the head, and died within minutes. Bass was shot multiple times but survived. Bass stated there was no one else nearby at the time.

Neighbors testified as to seeing two men walking down the street, hearing gunfire, and seeing the two men run toward a vehicle before speeding off. However, none of those neighbors could identify Austin as one of the men.

About a week after the shooting, Bass was presented with a photographic lineup, and when shown a picture of Austin, Bass remarked that Austin "would look more like" one of the assailants "if he was darker and shorter." At trial, when asked whether he recognized anybody in the courtroom as one of the shooters, Bass replied that he could not. Bass admitted, however, that he had identified Austin as one of the shooters in another court proceeding only a few days prior. Bass also stated that, the previous year, he saw Austin in a courtroom and believed Austin was one of the shooters. As Bass stated at trial, that identification was based on "[n]ot only just skin color, but just an inside feeling. Like, I just felt like it was him. I felt, like—I remember seeing a real quick, like, a flashback almost."

Forensic evidence linked Austin to the shooting. While examining the scene after the shooting, investigators observed a trail of blood that started two houses away and ended near a stop sign. DNA samples taken from along the trail matched Austin's DNA.

A DNA sample taken from the beginning of the trail matched Austin's DNA as well as Stewart's.

On the day of the shooting, Austin went to a hospital to receive treatment for a gunshot wound to his left ankle. Austin told an interviewing officer that he was in Fontana when he heard two gunshots behind him and started running. At trial, the officer testified that Austin's wound was at the top of his ankle, not the back, that there was no blood splatter on his jeans, and that he had no shoes. Austin first told the officer that he had no shoes because he was homeless. Later, Austin told the officer that he did have shoes but "ran out of them" when he was shot. Officers went to the place where Austin said the shooting occurred but could not find witnesses or evidence corroborating his account.

Austin testified in his own defense at trial. Austin admitted that he was at the scene (i.e., in San Bernardino) when the shooting occurred but stated that he was just a bystander. He also stated that he did not tell the officer where his shoes were—his mother's house—because he did not want the officer to go to his mother's house, as a cousin was staying there and may have had an outstanding warrant.

Austin's fiancée testified as well, stating that she had dropped him off in Fontana on the day of the shooting. Austin took the stand again afterward and testified that his fiancée was lying.

The jury convicted Austin, as charged, of murder (§ 187, subd. (a)), attempted murder (§§ 187, subd. (a), 664), and felon in possession of a firearm (§ 29800, subd. (a)).

4

The jury found true all but one of the special allegations it was asked to decide.[2] Upon Austin's waiver of a right to jury trial on the matter, the trial court found true the allegation that he had a prior strike. The trial court sentenced Austin to a total term of 109 years to life.

## II. DISCUSSION

Austin contends that the trial court erroneously excluded evidence that Bass, the attempted murder victim, had once shot himself during a robbery and later claimed to be a victim, even though the trial court allowed the jury to hear a stipulation that Bass "was convicted of a felony theft stemming from an incident on April 25, 2017" and had "falsely claimed he was a victim when he was, in fact, the person who had committed the theft." In other words, it was the fact that Bass shot himself during the robbery that Austin contends should have been admitted. Austin also contends that the jury should not have been given CALCRIM No. 315 when evaluating Bass's identification of Austin as the shooter. As we explain, we find no merit in either contention.

---

[2] For both the murder and the attempted murder, the special allegations were that Austin personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b)-(d).) Austin also was alleged to have committed the attempted murder willfully, deliberately, and with premeditation (§ 664, subd. (a)). The jury found not true the allegation that in the attempted murder Austin personally and intentionally discharged a firearm causing great bodily injury or death, but it found all other allegations true.

*A. Robbery Evidence*

Before trial, Austin filed a motion in limine to "admit evidence regarding witness Jordan Bass' February 16, 2018 prior conviction for PC 211, robbery, in which Mr. Bass shot himself during the course of robbing someone and lied about it, as such evidence is relevant to Mr. Bass' character for truthfulness." Austin asserted that such evidence "should be permitted without 'opening the door' to the defendant's character for violence, as outlined in California Evidence Code Section 1103, as the defense offers such evidence as a reflection of Mr. Bass' character for truthfulness, not his character for violence." After hearing argument, the trial court ruled that it was "going to exclude any reference to the firearm as part of the robbery incident." It added: "No mention that he shot himself. You can mention, obviously that he claimed that he was the victim when, in fact, he was the perpetrator. And leave it at that." The parties then agreed to the stipulation noted above, which the court read to the jury.

"We review a trial court's decision to exclude evidence for abuse of discretion. [Citation.] The decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].'" (*People v. Peoples* (2016) 62 Cal.4th 718, 745.)

Austin contends that the fact that Bass had shot himself was admissible under Evidence Code sections 1101, subdivision (c), and 1103, subdivision (a). This is correct,

but these sections merely mean that the evidence was not inadmissible, which is not the same as meaning that the evidence must have (or should have) been admitted.

Evidence Code section 1101, subdivision (a) generally provides that "evidence of a person's character . . . is inadmissible when offered to prove his or her conduct on a specific occasion." Subdivision (c), however, provides a relevant exception, stating that "[n]othing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." Similarly, Evidence Code section 1103, subdivision (a) states that "[i]n a criminal action, evidence of the character . . . of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code] Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

The fact that the evidence here—that Bass shot himself during a robbery—was not barred by Evidence Code sections 1101 and 1103 does not mean that it must have been admitted. Evidence must be relevant to be admissible (Evid. Code, § 210), and the fact that Bass shot himself during the robbery was not relevant to credibility or truthfulness.

The jury heard a sanitized version of the evidence, which was that Bass falsely claimed he was a victim of a felony when he was actually the perpetrator. Austin's observation on appeal that Bass was willing to lie "in a situation where he had been shot" is inconsequential; such a fact does nothing more to undermine Bass's credibility than what the jury heard. Austin offers no reason for us to conclude, for example, that as much as it takes a person to lie about a felony, it takes an even greater liar to lie about

7

being shot.  Much the same is true with Austin's statement that the evidence showed Bass's "propensity to lie to the police to minimize his involvement in a crime"; what the jury heard already conveyed this propensity, and the specific fact that Bass was shot would not have demonstrated any heightened propensity.[3]

Austin contends that the evidence showed Bass "may have actually returned fire at his assailants, or that Stewart had fired a weapon before being killed."  But this is separate from an argument that the evidence was relevant to show Bass's truthfulness, and because Austin did not propose this alternative basis for impeachment in trial court, he may not do so here.  (See *People v. Alvarez* (1996) 14 Cal.4th 155, 200 [defendant "may not offer an argument here that such evidence would have been relevant for impeachment because he did not offer any to that effect below"].)  Additionally, Austin's arguments that the evidence was relevant to bolster his story that he was a bystander and to show reasonable doubt that he was armed both fail, as they assume that the evidence was originally offered to show that Bass or Stewart may have been armed.[4]

---

[3] The jury heard other evidence about Bass's credibility as well, as Bass testified that he initially identified himself to police using his brother's name and date of birth after the shooting because he was trying to hide the fact that he had a warrant.

[4] Austin does not raise an ineffective assistance of counsel claim, but we note that such a claim would likely have failed, as Austin's trial counsel had a reasonable, tactical goal of preventing the prosecution from introducing evidence of Austin's prior criminal history with firearms.  (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 ["a reviewing court defers to counsel's reasonable tactical decisions" when reviewing an effective assistance claim]; Evid. Code, § 1103, subd. (b) [introducing victim's trait of character for violence opens the door to showing the same for defendant].)  It is likely that Austin's use of the evidence for a character trait would have opened the door to his prior

*[footnote continued on next page]*

Accordingly, we find no abuse of discretion.

*B.* CALCRIM No. 315

Austin contends that the trial court violated his constitutional right to due process by instructing the jury that it could consider a witness's certainty in evaluating that witness's credibility when identifying a defendant. We find no violation.[5]

As an initial matter, we decline to find the issue forfeited, even though Austin did not object to the instruction in trial court. "'[R]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been

---

conviction involving firearms as well. Separately, and in any event, evidence that *Bass* previously shot himself during a robbery, in isolation, has no bearing whatsoever on whether *Stewart* fired a weapon before being killed, despite what Austin claims.

[5] The instruction as given to the jury reads as follows, with the portion at issue here italicized: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] • Did the witness know or have contact with the defendant before the event? [¶] • How well could the witness see the perpetrator? [¶] • What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] • How closely was the witness paying attention? [¶] • Was the witness under stress when he or she made the observation? [¶] • Did the witness give a description and how does that description compare to the defendant? [¶] • How much time passed between the event and the time when the witness identified the defendant? [¶] • Was the witness asked to pick the perpetrator out of a group? [¶] • Did the witness ever fail to identify the defendant? [¶] • Did the witness ever change his or her mind about the identification? [¶] • *How certain was the witness when he or she made an identification?* [¶] • Are the witness and the defendant of different races? [¶] • Was the witness able to identify other participants in the crime? [¶] • Was the witness able to identify the defendant in a photographic lineup? [¶] • Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

9

futile or wholly unsupported by substantive law then in existence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 92.) At the time of Austin's trial, our Supreme Court had approved of the instruction on the eyewitness certainty factor. (See *People v. Sanchez* (2016) 63 Cal.4th 411, 461-462.) The trial court would therefore have been bound to reject any argument against the instruction.

On the merits, as noted earlier, our Supreme Court has recently reconsidered CALCRIM No. 315's certainty factor in *Lemcke*. *Lemcke* rejected the defendant's argument that the instruction violated his due process rights. (*Lemcke*, 11 Cal.5th at pp. 646-647, 654-661.) The Court nevertheless acknowledged that the instruction had "the potential to mislead jurors," given the "near unanimity in the empirical research that "'under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy.'"" (*Id.* at p. 665.) But because of the complexities involved in determining how to revise the instruction, the court stopped short of attempting to rewrite it. (*Id.* at p. 668.) Instead, the Court referred the matter to the Judicial Council and the council's Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Id.* at p. 647; see also *id.* at p. 668.) In addition, the court exercised its supervisory powers to "direct that until the Judicial Council has completed its evaluation, trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Lemcke*, *supra*, 11 Cal.5th at pp. 647-648; see also *id.* at p. 669.)

For the reasons set forth in *Lemcke*, we reject Austin's argument that his due process rights were violated. The instruction given here did not expressly equate certainty with accuracy. (See *Lemcke*, *supra*, 11 Cal.5th at p. 657.) Even if it were susceptible to that interpretation, Austin could have proffered expert testimony combating the interpretation, as the defendant in *Lemcke* did. (See *id.* at pp. 657-658.) Moreover, other instructions given to the jury undercut any argument that the certainty instruction lowered the People's burden of proof. (See *id.* at p. 658.) The trial court instructed the jurors that Austin was presumed innocent and that the People had the burden of proving guilt beyond a reasonable doubt. (See CALCRIM No. 220; *Lemcke*, at p. 658.) The trial court further instructed the jury that "[p]eople sometimes honestly . . . make mistakes about what they remember" (see CALCRIM No. 226), that the jury was responsible for "judg[ing] the credibility or believability of the witnesses" (see *ibid.*), and that the People had "'the burden of proving beyond a reasonable doubt that it was [Austin] who committed the crime'" (see CALCRIM No. 315; *Lemcke*, at p. 658 [noting that inclusion of same instructions allowed the jury to "'remain[] free to exercise its collective judgment to reject what it did not find trustworthy or plausible'"]). And Austin had an opportunity to cross-examine Bass, the witness Austin here argues identified him with certainty. (See *id.* at p. 660.)[6]

---

[6] Austin contends that Bass "unwaveringly believed" Austin was one of the shooters at trial, but Bass's certainty at trial was ambiguous at best. As noted, when Bass was asked whether he recognized anybody in the courtroom as one of the shooters, Bass said he could not, even though he soon thereafter identified Austin as someone he *previously* identified as one of the shooters. Furthermore, Bass's first identification of

*[footnote continued on next page]*

We therefore find that CALCRIM No. 315 did not violate Austin's due process rights[7]. (*Lemcke*, *supra*, 11 Cal.5th at p. 661.)

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL           
J.

We concur:

MILLER         
        Acting P.J.
SLOUGH         
J.

---

Austin was even less certain.  When shown a picture of Austin during a photographic lineup approximately a week after the shooting, Bass stated that Austin "would look more like" one of the suspects "if he was darker and shorter."

[7] Because *Lemcke* was decided during the pendency of this appeal, we allowed the parties to file supplemental briefs addressing the case.  Austin filed a supplemental brief, which we have read and considered.