Filed 4/20/23  P. v. Salas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078838 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB18002597) |
| ENRIQUE SALAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Ronald M. Christianson, Judge.  Remanded for resentencing.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Christine Y. Friedman, and Marvin E. Mizel, Deputy Attorneys General, for Plaintiff and Respondent.

Enrique Salas was convicted of attempted, premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 667) and assault with a deadly weapon (§ 245, subd. (a)(2)). The jury found firearm and great bodily allegations to be true. It also found an alleged prior strike, a prior serious felony, and a prior prison term true in a bifurcated trial. Salas requested a bifurcated trial on a gang enhancement charge, which the court denied. However, the jury was unable to reach a verdict on that charge, and it was dismissed.

At sentencing, the court noted that Salas had engaged in a pattern of violent conduct, and that his adult convictions are numerous and increasing in seriousness, and it expressed concern that Salas would continue to be a danger to others in the community. It declined to exercise discretion to strike or stay enhancements, stating that the maximum sentence was appropriate. It sentenced Salas to life in prison with a minimum parole eligibility of 14 years and 25 years to life, to run consecutive, for the enhancement of discharging a firearm causing great bodily injury. It also stayed the eight-year sentence it imposed for the assault with a firearm conviction, the aggravated term of 10 years for use of a firearm, and a three-year sentence for the great bodily injury allegation.

Salas appeals, contending the court erred by denying his request to bifurcate the gang allegation, by issuing jury instruction CALCRIM No. 315, which lists a witness's level of certainty among factors in evaluating eyewitness identifications, by failing to consider its discretion to issue a lesser enhancement under sections 12022.5, subdivision (a) or 12022.53, and by relying on aggravating circumstances that were not properly proved under the now-applicable version of section 1170, subdivision (b). He also contends

---

[1] Further section references are to the Penal Code unless otherwise specified.

2

a series of changes and clarifications to sentencing laws that apply retroactively could lead to a shorter sentence.

We conclude that Salas was not prejudiced by the court's denial of the request to bifurcate the gang allegation or its use of CALCRIM No. 315. However, in light of the number of statutory changes and clarifications that apply to nonfinal matters and that could individually or cumulatively affect the court's imposition of sentence length in this case, we remand the matter for resentencing, where Salas can present his sentence-related arguments for the superior court to consider.

BACKGROUND AND PROCEDURAL FACTS

Around 2:40 p.m. on July 7, 2018, C.D., an African-American man in his 20's, was on the sidewalk outside the Westwind Mobile Home Park (Westwind) on 4th Street in Yucaipa. A Hispanic man in a hat and sweats with a red band at the waist, who was standing across the street outside the Rancho del Sol Mobile Home Park (Rancho del Sol), ran into the middle of 4th Street and shot C.D. three times. C.D. fell, and the shooter ran into the entrance of Rancho del Sol. When C.D. got back up, the shooter ran back to the middle of the street and shot C.D. three more times, causing C.D. to fall to the ground. The shooter then fled through Rancho del Sol.

E.W., the manager of Rancho Del Sol, was in the mobile home closest to 4th Street, and he saw the shooter's arm raised and heard two sets of three shots. The manager chased the shooter, who had a gun tucked into his waistband area, through Rancho del Sol before losing track of the shooter between 3rd and 4th Streets. He described the shooter as wearing gray and black sweats. In court, E.W. identified Salas as the man he chased.

M.J. observed the shooting as he was driving down 4th Street. He could not identify the shooter on the day of the incident, but he was 90

3

percent sure of his identification of Salas as the shooter at an infield showup, and he thought the gun used was a pistol.

D.B. looked toward 4th Street from inside Westwind when she heard the shots. She saw a tall male with black hair, wearing a black shirt and red shorts underneath another pair of shorts. She observed him shoot C.D., who was wearing blue, and then run into Rancho del Sol. She did not see the gun, but she identified Salas as the shooter in court.

J.S. went outside her Westwind mobile home when she heard gunshots, and she saw Salas fire three shots from a revolver into the victim before running away. She said the shooter wore black shorts with red shorts underneath so that a waistband of red showed, and he wore a dark-colored shirt. She identified Salas as the shooter that day.

San Bernardino County Sheriff Deputy Melissa Miller responded to a "shots fired" call on 4th Street around 2:40 p.m. She found C.D. on the ground on the west side of the street in front of Westwind. He was unarmed. No shell cases were located near C.D. or in an enlarged search area, leading deputies to believe a revolver was used.

At around 2:45 p.m., a Hispanic man wearing a black T-shirt and red jogging shorts, walked into J.H.'s backyard and appeared to be holding something in the waistband of his shorts. J.H. began chasing him. The person jumped the fence and ran away. J.H. later discovered balled-up gray shorts between a brick wall and a shed in his backyard; a deputy collected the shorts.

When deputies encountered Salas around 2:55 p.m. in the storage area of the Yucaipa Land Yacht Mobile Home Park, located between 3rd and 4th Streets, he was wearing red shorts and no shirt. Salas was out of breath and his entire body was sweaty; there was methamphetamine on the ground next

4

to him, and deputies recovered four hypodermic needles from his person. Salas's hands tested negative for gunshot residue. Deputies arrested Salas and placed him in the back of the patrol unit. Behind some nearby bushes, one deputy found a black shirt that matched one description of what the shooter had worn.

Deputy Chris Coillot conducted infield showups, transporting witnesses one by one to observe Salas from inside the patrol car. The deputy read each witness an admonition before the witnesses answered whether Salas was the shooter. Witnesses D.B. and J.S. each identified Salas as the shooter. M.J. said he was 90 percent sure Salas was the shooter.

At trial, D.B., J.S., E.W., two residents of Westwind and the manager of Rancho del Sol, identified Salas as the shooter. They each described what the shooter wore. D.B. testified the shooter may have been wearing a black shirt and two pairs of shorts; the inner pair of shorts was red. J.S. testified that the shooter wore a black or dark blue shirt, sagging black shorts, and red shorts under the black ones. E.W. testified the shooter wore some combination of black and gray. He testified about surveillance video footage captured by Rancho del Sol cameras that showed the shooter running through Rancho del Sol. The prosecution played that video for the jury.

Another witness, W.G., testified the shooter wore a black T-shirt and gray basketball shorts. He also testified that his mobile home's surveillance camera captured a video of the events. The prosecution played the video for the jury; it showed a person cross 4th Street from Rancho del Sol and shoot C.D.

C.D. underwent surgery the day of the shooting for gunshot wounds to his stomach, chest, arm, thigh, and back; he is paralyzed from the waist down.

5

G.J. witnessed the shooting and testified the shooter wore a black T-shirt and beige shorts. She could not remember the shooter's face, and at her infield showup, she told police the shooter had a darker complexion than Salas.

M.H. also witnessed the shooting. He described the shooter as wearing a black shirt and gray pants. At the infield showup, he told police the shooter wore different clothing than Salas was wearing. He could not be sure of an identification.

R.G. witnessed somebody running into Rancho del Sol after he heard shots. He could not identify Salas as the shooter during the infield showup and said he could not identify the shooter in court because he did not see the person's face.

Several witnesses did not mention red shorts to the deputies.

One deputy commented loudly enough for witnesses to hear that "they got him, good," in reference to Salas being captured.

Michael Eisen, a psychologist who testified as an expert in eyewitness memory and suggestibility, explained facets of memory, factors associated with solid eyewitness identification, and the inherently suggestive nature of showups. He said it is common for people to feel more confident in their identifications over time.

Sheriff crime lab criminalist Jason McCauley explained that when a revolver fires at close range, there is typically more residue than a semiautomatic weapon of the same caliber. He analyzed the gunshot residue kit done on Salas and noted there were no characteristic particles present. Residue can be eliminated by sweating, washing hands, or wearing gloves.

## Gang Evidence

Salas moved in limine to bifurcate the trial on gang evidence, and the court denied the motion.

The parties stipulated that Northside Rialto (NSR) is a criminal street gang within the meaning of section 186.22. No photographs or documentation related to the street gang were admitted.

Salas is a member of NSR, a Hispanic gang based in Rialto. He has numerous tattoos that indicate his membership.

C.D. is a member or associate of the Five Times Crips, a gang with a territory that borders San Bernardino and Rialto. He was not "claiming" Five Times in Yucaipa, where he was living with his grandfather, and he did not know Salas. However, he had numerous Five Times tattoos, including on his neck, and he wore mostly blue, his gang's color, on the day he was shot. Five Times and No Cuts, a Crip gang subset that also wears blue, are primarily allies. NSR is a direct rival of No Cuts.

Sergeant Robert Raymond Morales testified as a gang expert. He explained that NSR has common signs or symbols. He opined that Salas's tattoos were common to NSR; a person who is not a member of that gang would not have such tattoos, and a non-member of that gang sporting such tattoos could be targeted for assault or death.

When given a hypothetical that mirrored the evidence in this case, Sergeant Morales opined that the shooting was done for the benefit of NSR, with the specific intent to promote, further, or assist in criminal conduct by that gang. He explained the shooting would enhance the gang member's reputation and the gang's reputation because it showed the members of NSR were gang members who also had "a tendency to be violent and are brazen."

The prosecution introduced testimony that a resident of Rancho del Sol had NSR gang paraphernalia in his residence and sported multiple NSR gang tattoos. Sergeant Morales testified that the fact that another NSR member lived in the mobile home park where the shooting occurred showed there was another gang member to vouch for the incident to enhance the shooter's reputation. That person could also be there to aid and abet.

*Jury Instructions & Closing Arguments*

The trial court indicated neither party objected to any jury instructions, and neither requested additional instructions.

The court instructed the jury with CALCRIM No. 315, the eyewitness identification instruction, and CALCRIM No. 332, which directed the jury to consider the experts' testimony. The jury was instructed with CALCRIM No. 1401, the instruction on a gang enhancement, modified to delete the definition of a criminal street gang.

In closing arguments, defense counsel told the jury the case boiled down to identification. He challenged the witness identifications in various ways, arguing that some of the witnesses "hemm[ed] and haw[ed]," and that suggested their uncertainty. He pointed out that although Salas wore red shorts when arrested, the witnesses did not describe the shooter wearing red shorts. He argued that witnesses may have been influenced by the deputies on scene, who he suggested were biased in their belief that Salas was the shooter. He also pointed out discrepancies in the various deputies' testimony and their recollection of the events. Defense counsel further emphasized potential issues associated with witness identification and memory.

Defense counsel highlighted the lack of physical evidence tying Salas to a weapon, arguing there was no gun shot residue on the defendant, and no gun was ever found.

8

*Verdicts*

The jury found Salas guilty of count 1, premeditated attempted murder, and count 2, assault with a deadly weapon. It found the firearm and great bodily allegations to be true. The jury was unable to reach a verdict on the gang enhancement charge. The People moved to dismiss that count, and the court granted that motion.

A bifurcated trial was held on the alleged prior strike, the prior serious felony, and the prior prison term. The alleged priors were based on a 2016 robbery conviction and a separate conviction for assault by means of force likely to produce great bodily injury. The prosecution presented certified records of those convictions, and the jury found the alleged priors to be true.

*Sentencing*

Defense counsel asked the court to take into consideration Salas's youthful age at the time of the crime; he was 21. Although Salas was under the age of 25 at the time of the shooting, he was not eligible under the youthful parole statute because he suffered a prior strike for which he had been convicted. Defense counsel also noted for the court that new statutes gave the court discretion to strike the gun enhancement under section 12022.53.

The court sentenced Salas on December 4, 2020, imposing life in prison with a minimum parole eligibility of 14 years for count 1, the premeditated attempted murder with the enhancement of a prior strike being found true. Consecutive to that, for the enhancement of discharging a firearm causing great bodily injury, the court sentenced Salas to 25 years to life. It stayed the enhancements under section 12022.53, subdivisions (b) and (c) as well as the enhancement of great bodily injury under section 12022.7, subdivision (a), pursuant to section 12022.53, subdivision (f).

9

With respect to count 2, assault with a firearm, the court imposed the upper term of four years, doubled to eight years, for the admission of a prior strike. It stayed the sentence under section 654. It also imposed an aggravated term of 10 years for the use of a firearm (§ 12022.5, subd. (a)). It stayed that sentence under section 654.

It also imposed and stayed three years for the great bodily injury allegation (§ 12022.7, subd. (a)) on count 2, and it struck the enhancement under section 667.5, subdivision (b). The court found the mitigation materials insufficient to justify any leniency in the case. In imposing this sentence, the court referenced and relied upon four aggravating factors in the probation report. The court stated:

> [Defendant] has engaged in a pattern of violent conduct which shows that if not in prison, he will continue to be a danger to others in the community. Prior to conviction of attempted murder with use of a firearm causing great bodily injury in this case, the defendant was previously convicted in separate incidents of robbery and of assault by means likely to produce great bodily injury.

> The defendant's convictions as an adult are numerous and of increasing seriousness. The defendant has served a prior prison term and was on a grant of parole at the time of the current offense.

For those reasons, the court declined to exercise its discretion to strike or stay any enhancements and stated the maximum sentence was appropriate.

DISCUSSION

I.

ASSEMBLY BILL NO. 333

Salas contends that Assembly Bill No. 333 (Assembly Bill 333) applies to his case and requires us to reverse the judgment because the court denied his request to bifurcate the trial on the gang-related enhancements.

Among other changes, Assembly Bill 333 (Stats. 2021, ch. 699), which became effective January 1, 2022, amended section 186.22 to impose additional elements necessary to prove the substantive crime of active participation in a criminal street gang (§ 186.22, subd. (a)) and the related gang sentencing enhancement allegation (*id.*, subd. (b)). Specifically, the bill narrowed the definition of " 'criminal street gang' " to "an ongoing, organized association or group of three or more persons . . . having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f); *People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344.)

Assembly Bill 333 also amended the statutory definition of a " 'pattern of criminal gang activity' " under section 186.22, subdivision (e). The definition now requires that the commission or attempted commission of two or more statutorily-enumerated offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) It also prohibits using the currently-charged offense to establish the pattern of criminal gang activity, requires the offenses to commonly benefit a criminal street gang, and

requires the common benefit of the offense to be "more than reputational." (*Id.*, subds. (e)(1) & (2).)

Additionally, Assembly Bill 333 added section 1109, which requires the court to bifurcate substantive charges and enhancement allegations under section 186.22 upon the defendant's request. (Stats. 2021, ch. 699, § 5, eff. Jan. 1, 2022). The bifurcated trial on a gang enhancement occurs after the defendant is first found guilty of the charged offense. (§ 1109, subds. (a)(1) & (2); *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64-65 (*Ramirez*).)

Salas contends Assembly Bill 333 is retroactive under the rule established in *In re Estrada* (1965) 63 Cal.2d 740, 744-746, a case in which the Supreme Court held that statutory amendments that reduce a punishment apply retroactively when amendments to the Penal Code are silent regarding their retroactivity and judgment is not final. The Attorney General concedes that the substantive amendments to section 186.22 are retroactive to nonfinal cases[2] but challenges the retroactivity of section 1109, which is a procedural provision. As the Attorney General notes, the Courts of Appeal are split on whether section 1109 applies retroactively. (See *Montano, supra,* 80 Cal.App.5th at pp. 105-108 [finding section 1109 retroactive]; *Ramos, supra,* 77 Cal.App.5th at pp. 1126-1127 [same]; *Burgos, supra,* 77 Cal.App.5th at pp. 564-567, review granted [same]; but see

---

[2] Other courts have uniformly reached this conclusion, as well. (See, e.g., *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126-1128 (*Ramos*); *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-567 (*Burgos*), review granted July 13, 2022, S274743; *People v. Perez* (2022) 78 Cal.App.5th 192, 206-207, (*Perez*) review granted Oct. 12, 2022, S275090; *Ramirez, supra,* 79 Cal.App.5th at pp. 63-64; *People v. Montano* (2022) 80 Cal.App.5th 82, 104 (*Montano*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 (*E.H.*); *People v. Sek* (2022) 74 Cal.App.5th 657, 667.)

*People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103 [finding section 1109 applies only prospectively]; *Ramirez, supra,* 79 Cal.App.5th at pp. 64-65 [same]; *Perez, supra,* 78 Cal.App.5th 192, review granted [same].)

We do not need to resolve this issue because even were we to assume that section 1109 applies retroactively, we conclude Salas was not prejudiced by the failure to bifurcate the gang enhancement.[3]

First, we find unpersuasive Salas's contention that the failure to bifurcate gang enhancements under section 1109 "likely constitutes 'structural error,' " which would defy harmless error analysis and require reversal per se. (*Burgos, supra,* 77 Cal.App.5th at p. 568, review granted.) "There is a strong presumption that any error falls within the trial error category" and is "subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) Section 1109's purpose is to prevent the jury from being swayed by prejudicial gang evidence in deciding the defendant's guilt on the underlying offense. (Assem. Bill. 333, § 2, subd. (d)(6).) However, as is the case with any alleged evidentiary error, the probable effect of allowing a jury to hear such gang evidence may be quantitatively assessed; it is not a structural error that defies harmless error analysis. (*Montano, supra,* 80 Cal.App.5th at p. 108 [rejecting suggestion of structural error]; see also *Ramos, supra,* 77 Cal.App.5th at pp. 1131-1133 [applying *Watson* harmless error standard in finding defendant not prejudiced by failure to bifurcate gang enhancement allegation]; *E.H., supra,* 75 Cal.App.5th at p. 480 [explaining defendant could not show it was

---

3    The jury did not reach a verdict on the gang enhancement charge, and the People moved for it to be dismissed.  Thus, Salas also was not prejudiced by any finding of guilt on that charge.

reasonably probable he would have obtained a more favorable result if trial had been bifurcated].)

Nothing in section 1109 prohibits use of a defendant's gang membership as evidence on the issue of motive or another issue provided for in Evidence Code section 1101, subdivision (b). Indeed, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see *Ramos, supra*, 77 Cal.App.5th at p. 1132 ["[I]t is likely some . . . of the evidence of Ramos's gang membership and the gang rivalry would have come in at a trial on just the substantive offenses. . . ."]; see also *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 [gang membership and activities relevant to prosecution theory of how and why victim was killed].) Here, Salas's participation in a gang supplied the motive for the otherwise seemingly inexplicable conduct of the shooter firing a weapon without provocation or any relationship to the victim.

Further, the gang evidence was relatively sanitized and not inflammatory. The parties stipulated that NSR was a criminal street gang, and neither party presented evidence about the most inflammatory aspects of the gang. The testimony focused on information about the gang's signs and symbols, as well as its territory and rivals. Sergeant Morales testified that the shooting would enhance Salas's and NSR's reputation because it showed they had "a tendency to be violent and are brazen." There was testimony about the presence of another NSR gang member in Rancho del Sol, but only

14

for the purpose of explaining that the other gang member present could vouch for the incident or be available to aid the shooter, as part of developing the motive in the case.

Moreover, the prosecution did not use the gang evidence to demonstrate Salas's guilt; there was no dispute that C.D. was the victim of a premeditated attempted murder and assault with a firearm. The dispute here regarded who committed the act.

The prosecutor also did not focus on Salas's membership in gang to prove identity. Instead, the prosecutor primarily relied on video evidence and witness identifications to identify Salas as the shooter. That evidence overwhelmingly supports the verdict. Several witnesses identified Salas as the shooter during infield showups, and they restated their identifications in court. E.W., who witnessed the shooting and chased the shooter, identified Salas. Witnesses' descriptions of the shooter were consistent with one another, predominantly describing the shooter as wearing a black shirt and two pairs of shorts with the inner pair red, or identifying the grey outer pair. When Salas was detained, he was wearing a pair of red shorts and no shirt, and deputies recovered a black shirt in some nearby bushes and balled up gray shorts in one of the yards where Salas had been chased. Further, the video footage appeared to corroborate the testimony. It is simply not reasonably probable that Salas would have received a more favorable result had the gang enhancement, the dismissed charge, been tried separately. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Accordingly, the failure to bifurcate the gang enhancement did not result in a miscarriage of justice and was harmless as to the underlying convictions. (See *Ramos*, *supra*, 77 Cal.App.5th at pp. 1125-1132; *E.H., supra,* 75 Cal.App.5th at pp. 478-480.)

15

## II.

## CALCRIM NO. 315

Salas next argues that the court erred by providing CALCRIM No. 315, which lists factors to consider in determining whether an eyewitness's identification is accurate, contending that jurors may have been led "to conclude all the certain identifications were accurate." We review challenges to jury instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Our Supreme Court addressed this issue in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). *Lemcke* held that listing the witness's level of certainty among the factors a jury considers under CALCRIM No. 315 to evaluate eyewitness identifications does not render a trial fundamentally unfair or otherwise amount to a due process violation. (*Lemcke*, at pp. 647, 660-661.) Nothing in the instruction operates "to 'lower the prosecution's burden of proof' " because "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.]" (*Id.* at pp. 647, 657, 658.)

The defendant in *Lemcke* presented a rigorous identification defense, his counsel cross-examined investigating officers to explore problematic aspects of identification procedures, and he called an eyewitness expert who "testified at length about the weak correlation between certainty and accuracy, particularly with respect to in-court identifications." (*Lemcke*, *supra*, 11 Cal.5th at p. 660.) In the end, although the court acknowledged that "an enhanced or modified version of the certainty instruction might well be advisable," it explained that the inclusion of witness certainty as a factor for jurors to consider nonetheless did not establish a due process violation. (*Id.* at p. 661.)

The case before us is comparable. Like the defendant in *Lemcke*, Salas presented a rigorous defense challenging his identification as the shooter,

16

questioning the credibility of witnesses and what may have influenced their identifications, and noting the lack of physical evidence connecting him to the scene. Salas also offered expert testimony to challenge the accuracy of witness identifications. Further, the jury was instructed that the People bore the burden of proving beyond reasonable doubt that it was the defendant who committed the crime (CALCRIM No. 315) and that it was required to consider the expert's testimony (CALCRIM No. 332). And defense counsel reiterated the People's burden of proof in closing arguments. These actions helped ensure fairness.

We recognize that the Supreme Court has directed trial courts to omit the certainty factor from CALCRIM No. 315 going forward, until the Judicial Council can consider how the language might be better worded to minimize any possible juror confusion on that point. (*Lemcke, supra*, 11 Cal.5th at pp. 668-669.) However, "nothing in CALCRIM No. 315's instruction on witness certainty operates to 'lower the prosecution's burden of proof.' " (*Lemcke*, at p. 657.) It leaves it to the jury to decide the credibility of a witness's level of certainty and what weight to assign the certainty. (*Ibid.*) Additionally, nothing in CALCRIM No. 315 suggests to a jury that it should ignore expert testimony regarding witness certainty. (*Lemcke*, at p. 658.)

Here, like in *Lemcke*, other instructions undercut the claim that the certainty language lowers the burden of proof. (*Lemcke, supra*, 11 Cal.5th at p. 658.) The court instructed the jury that Salas was presumed innocent, and that the prosecution bore the burden of proving the crimes beyond a reasonable doubt, and CALCRIM No. 315 states that the People bear the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. Under these facts, the reference to witness certainty was not error.

## III.

## CHANGES TO SENTENCING REQUIREMENTS

Salas also presents a series of arguments regarding the court's discretion to sentence him based on recent changes and clarifications to the law that individually or cumulatively could impact the length of sentence. We detail those changes and clarifications below.

### A. Assembly Bill No. 518

Assembly Bill No. 518, effective January 1, 2022, amended section 654, subdivision (a), so that the court is no longer required to impose sentence based on the "longest potential term of imprisonment," staying other terms. (§ 654, former subd. (a); Stats. 2021, ch. 441, § 1.) "[S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) This means the court could now opt to sentence Salas for the assault conviction and stay the attempted murder conviction.

### B. Senate Bill No. 567

Senate Bill No. 567 amended subdivision (b) of section 1170 by making the middle term the presumptive term unless aggravating circumstances justifying a higher term have been stipulated to by the defendant or found true beyond a reasonable doubt by the jury. (§ 1170, subd. (b)(1)-(3).) These amendments apply retroactively. (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 ["The People properly concede that Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022"].) Here, the court sentenced Salas to the upper term on count 2 before staying it, and the court considered two aggravating factors that were not stipulated to or found true beyond a

18

reasonable doubt by the jury. Under the current version of section 1170, subdivision (b), the court would have to take into consideration fewer aggravating factors in sentencing Salas.

C. People v. Tirado (2022) 12 Cal.5th 688

Section 12022.53 requires the court to impose an additional, consecutive sentence of 10, 20, or 25 years to life for use of a firearm, discharge of a firearm, or discharge of a firearm causing great bodily injury, respectively. (§ 12022.53, subs. (b)-(d).) Effective January 1, 2018, section 12022.53 was amended to provide the court with discretion to strike or dismiss an enhancement that was otherwise required. (§ 12022.53, subd. (h).) In January 2022, our Supreme Court held in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) that the superior court had discretion under section 12022.53, subdivision (h) and section 1385 to impose penalties under section 12022.53, subdivisions (b), (c), or (d) if the facts required within the applicable subdivision were alleged and found true. (*Tirado*, at pp. 696, 702.) The superior court also has discretion to impose a sentence for a charged or uncharged lesser enhancement when the facts supporting the lesser enhancement have been alleged and found true. (*Id.* at p. 697.) That means a trial court can strike a section 12022.53, subdivision (d) enhancement and impose the sentence outlined under subdivisions (b) or (c), or it can even impose the sentence applicable to the enhancements in section 12022.5, subdivision (a).[4] (*Tirado*, at p. 700.) This discretion applies retroactively to nonfinal cases (*People v. Chavez* (2018) 22 Cal.App.5th 663), which means the court could have imposed a significantly shorter sentence for the firearm

---

4    Section 12022.5 subdivision (a) provides for sentences of three, four, or 10 years for personal use of a firearm in the commission or attempted commission of a felony.

19

enhancement had it chosen to exercise its discretion in that manner. Although the court was aware of its discretion to strike or dismiss an otherwise-required enhancement, there was a split of authority regarding the extent of that discretion that was not clarified until after the court sentenced Salas. (See *Tirado*, at pp. 697-702.)

### D. Senate Bill No. 81

Finally, Senate Bill No. 81, which applies to all sentencing after January 1, 2022, added subdivision (c) to section 1385. Subdivision (c)(1) provides in part, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so." Subdivision (c)(2) of this statute provides in part, "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove" various "mitigating circumstances."

"Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) One such circumstance is whether the application of the enhancement could result in a sentence of over 20 years. (*Id.,* subd. (c)(3)(C).) In such instances, unless the court finds dismissal would endanger public safety, the enhancement shall be dismissed. (*Id.,* subds. (c)(2) & (c)(3)(C).) While the Attorney General argues that Salas's callous and calculated conduct evidences his danger to public safety, the court would need to consider this characteristic directly when deciding whether to dismiss the firearm enhancement.

E.  Analysis

The Attorney General argues that remand is not necessary because the court had broad discretion of which it was aware when it imposed Salas's sentence in December 2020.  The Attorney General points out that the court stated it planned to impose the maximum possible sentence, and it imposed the upper terms on the assault conviction and firearm enhancements before staying those terms under section 654.  This argument resonates with us to some degree.  The court was authorized to consider whether the lower, middle, or upper term best served the interests of justice (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420(e); *People v. Lopez, supra,* 78 Cal.App.5th at p. 464), and it already could consider circumstances in aggravation and mitigation (Cal. Rules of Court, rule 4.420(b)).  Defense counsel alerted the court that it had discretion to strike the gun enhancement under section 12022.53, and because the lesser enhancements were charged and found true, the court had the authority to impose punishment under section 12022.53 subdivisions (b) or (c).  Moreover, the court stated its preference to impose the maximum sentence.  Further, the court clearly found aggravating factors relevant, and a single aggravating factor has been held sufficient to support an upper term.  (*People v. Osband* (1996) 13 Cal.4th 622, 728.)

However, considering the number of changes and clarifications that have occurred since the initial sentencing, we are not convinced that the trial court would "not, in any event have [imposed a lower punishment]." (*People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)  The Attorney General concedes that the court erred under new section 1170, subdivision (b) by relying on two aggravating circumstances that were not properly proved when it imposed the upper term on the assault conviction.  (See *People v. Dunn* (2022) 81

21

Cal.App.5th 394, 404, review granted Oct. 12, 2022, S275655 [all aggravating circumstances relied upon must meet requirements of section 1170, subdivisions (b)(2) or (b)(3)].)  And Salas contends that his attorney did not address matters that could have influenced the trial court's decision to impose lesser enhancements or sentences because he proceeded on the basis that the trial court's discretion was limited in a way that it now is not.  Salas also indicates that the court had no incentive to explore mitigation or otherwise evaluate whether a lesser sentence would have been appropriate considering the state of the law, particularly the law regarding firearm enhancements, at the time of sentencing.

Given the number of changes that indicate the Legislature's preference for reduced sentences and our uncertainty whether these changes would have individually or cumulatively altered the court's perspective, we deem it best to remand the matter for resentencing.  There, Salas can present his sentence-related arguments for the trial court to consider.  (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate' "]; *People v. Fuller* (2022) 83 Cal.App.5th 394, 400, review granted Nov. 22, 2022, S276762.)  We express no view on the sentence Salas may receive on remand.

## DISPOSITION

The matter is remanded for resentencing.  In all other respects, the judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.