Filed 6/28/24  P. v. Banks CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B327019 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA119101) |
| v. | |
| VAMAZAE ELGIN ALEXAN BANKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Wyatt E. Bloomfield and William H. Shin, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Vamazae Elgin Alexan Banks guilty of second degree robbery (Pen. Code,[1] § 211 [count 1]), assault with a firearm (§ 245, subd. (a)(2) [count 2]), and criminal threats (§ 422, subd. (a) [count 5]).[2] Banks admitted the allegation that he suffered two prior strike convictions under the Three Strikes law (§§ 667, subd. (d) & § 1170.12, subd. (b)), and admitted seven aggravating circumstances under California Rules of Court, rule 4.421. The trial court struck one of Banks's prior strike convictions pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and sentenced Banks to 11 years 4 months in state prison.

On appeal, Banks argues that the trial court violated his due process rights by improperly instructing the jury to consider a witness's certainty when determining whether the witness accurately identified him as the robber without also informing the jurors that certainty does not always correlate with accuracy. To the extent that the argument was forfeited by trial counsel's failure to object to the instruction, Banks argues that the error affected his substantial rights and that he was prejudiced by counsel's ineffective assistance.

We affirm the trial court's judgment.

---

[1] All further statutory references are to the Penal Code.

[2] The jury acquitted Banks of two counts of robbery. (§ 211 [counts 3 & 4].)

2

# FACTS AND PROCEDURAL HISTORY

*The Robbery*

### G.R.'s Testimony

G.R. was a manager at McDonald's Restaurant located at the cross-section of 4th Street and Bonito Street in Long Beach. On January 25, 2022, Banks entered the McDonald's at about 1:30 p.m. and asked to speak with the manager. Banks claimed he had been given a counterfeit $5 bill the night before and wanted to exchange it for a real $5 bill. G.R. spoke with him about the problem. She was standing about two feet away from Banks during the conversation. She could hear his voice clearly. Banks did not have anything covering his face, and G.R. could see his features clearly. G.R. asked the general manager if they could exchange the bill. The general manager said that, if Banks left his name and phone number, they could check the security cameras and verify whether he had been given a $5 bill the night before. Banks became frustrated and left the restaurant.[3]

At about 1:50 p.m., G.R. noticed that the door in the employee section that is supposed to stay closed was ajar. She attempted to close the door, but a person on the other side pushed it open. Once the door was pushed open, G.R. recognized the person to be the same person who had asked about the counterfeit $5 bill. Although Banks had a hoodie over his head

---

[3] At trial, defense counsel stipulated that Banks was the person who tried to exchange the bill, but argued he was not the robber.

and was wearing a mask over his nose and mouth, G.R. recognized him by his eyes and his voice. Banks pulled out a black gun, pointed it at her, and told her to open the registers. She complied because she feared for her life. Banks held the gun close to G.R., approximately a foot away. G.R. had to delete an order that had been left on the register, so it took her longer to input the code to open it. Banks held the gun to G.R.'s back and said: "'Hurry up.'" "'Do you want to die?'" "'I'll kill you.'" and "'I'll blow your brains out.'" Banks spoke the entire time. G.R. was able to see Banks as he pushed through the door and at points during the time that it took her to open the register. Banks was very close when he spoke to her. After G.R. opened the register, Banks began to grab the money. G.R. ran to call the police and check on her employees.

When she was certain Banks had left the restaurant, G.R. secured the store with the employees inside and called 911. In the call to 911, G.R. stated that the robber had a gun and that he had been in the McDonald's 15 to 20 minutes earlier asking to exchange a counterfeit bill.[4]

G.R. identified Banks at trial as the person who complained about the $5 bill and the person who robbed the restaurant approximately 15 to 20 minutes later.

### E.G.'s Testimony

E.G. also worked at McDonald's. She saw Banks in the store twice on January 25, 2022. E.G. first saw Banks at about 1:30 p.m. G.R. was talking to him about a fake $5 bill. E.G.

---

[4] The prosecutor played an audio recording of G.R.'s 911 call and a transcript of the call was provided for the jury.

4

could see Banks's face and the upper part of his body as he was talking to G.R.  She recalled that he was wearing a red top, and his pants were sagging, so she could see his underwear, which were off-white.

About 20 minutes after Banks left, E.G. was calling out orders and heard G.R. scream.  She saw Banks trying to get through the employee door, which was normally closed.  G.R. threw herself on the door to keep it shut, but Banks was able to push through.  E.G. recognized Banks as the person who was there before.  Banks had a sweatshirt hood over his head and a mask covering his mouth and nose.  E.G. recognized his voice as exactly the same voice as the person who had come in earlier.  Banks went to the register and said " 'Give me the money.' "  He pulled out a black gun and pointed it towards G.R.  E.G. was approximately 13 feet away from Banks as this occurred.  She could hear Banks clearly.  He told G.R. to give him the money and said something like, " 'I'm going to shoot you.' "  G.R. had trouble opening the register and Banks warned her to hurry up and give him the money and said he was going to shoot her.

There were employees behind E.G. trying to figure out what was going on.  E.G. warned everyone that Banks had a gun and to go to the back.  The employees were pushing through a side door and set off an alarm.  E.G. saw Banks flee the McDonald's and jump over the bushes.  As he did so, she noticed his underwear, which were the same off-white color the man who tried to exchange the $5 bill wore.

### The Investigation

Multiple video recordings taken from surveillance cameras inside the McDonald's and from locations nearby depicted Banks entering the McDonald's, conversing with G.R., and then exiting the McDonald's approximately seven minutes later. Banks was wearing a red, black, and white jacket, a black cap that was on backwards, and blue jeans. G.R. identified Banks in a video that depicted their conversation regarding the $5 bill.

The videos also depicted the robber entering the McDonald's, committing the robbery, and fleeing the scene. During the robbery, the robber is shown wearing a gray sweatshirt and carrying a black gun. E.G. is depicted in the video of the robbery, less than 10 feet away from Banks. The video of the robber fleeing from the McDonalds shows that he was wearing a red shirt and carrying a gray hooded sweatshirt. The robber was wearing shoes that appeared to be identical to the ones that Banks was wearing when he entered the McDonald's and tried to exchange the counterfeit $5 bill. Banks and the robber took the same path to and from the McDonald's.

Police identified Banks from the surveillance video as the person who attempted to exchange the $5 bill. The parties stipulated that "Banks was identified from the McDonald's surveillance video" and that G.R. identified Banks from a photograph taken from the video. Approximately 36 days after the robbery, Long Beach Police Department Officer Brian Komori conducted a traffic stop of a car in which Banks was a passenger. Officer Komari arrested Banks for robbery. The officer then conducted a search of the vehicle and discovered a duffle bag that

Banks admitted was his. The duffle bag contained a gray sweatshirt with the same stitching as the gray sweatshirt the robber had worn. During booking at the police station Officer Komari recovered a black mask and a counterfeit $100 bill from Banks's pockets.

## DISCUSSION

At trial, the court instructed the jury that in evaluating identification testimony, the jury must consider, among other questions, "How certain was the witness when he or she made an identification?", but excluded from the instruction the following bracketed language:

"A witness's expression of certainty about an identification, whether the identification was made before or at the trial, may not be a reliable indicator of accuracy. Among the factors you may consider when evaluating the significance of the witness's certainty in the identification are the following:

"How soon after the event did the witness express certainty about the identification?

"If the witness made an identification before trial, did the witness express certainty at the time of that identification?

"Before the identification, did the witness express confidence in being able to make an identification?

"How confident was the witness in making the identification?

"Did the witness receive information before or after the identification that may have increased the witness's level of confidence?

"Did the police use procedures that increased the witness's level of confidence about the identification?

"<insert other relevant factors raised by the evidence>" (CALCRIM No. 315.)

Banks contends the trial court erred by omitting the bracketed language from its instruction using CALCRIM No. 315, which should be given when an eyewitness professes to be certain in their identification of the defendant.[5] (Bench Notes to CALCRIM No. 315.) Banks argues the bare instruction on witness certainty conflicts with scientific research showing that witness certainty is not necessarily a reliable measure of accuracy.

Defense counsel failed to object to the form of the instruction at trial. We must address Banks's claim on the merits to determine whether his substantial rights were compromised and forfeiture is excused. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579–580.) Banks further argues he was prejudiced by trial counsel's ineffective assistance in failing to object to the form of the instruction.

---

[5] The Bench Notes to CALCRIM No. 315 provide:

"Whenever there is evidence a witness has expressed certainty about an identification, give the bracketed language beginning with 'How certain was the witness' and the bracketed paragraph that begins with 'A witness's expression of certainty' along with any applicable bracketed factors.

"Whenever there is evidence a witness has expressed doubt about an identification, give the bracketed language beginning with 'How certain was the witness' upon request, and do not give the bracketed paragraph that begins with 'A witness's expression of certainty' nor any of the factors that follow."

### *Substantial Rights*

Citing to our Supreme Court's recent opinion in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemke*), Banks argues that the certainty instruction violated his right to due process because it: (1) was misleading, confusing, and lowered the prosecution's burden of proof, and (2) deprived him of a meaningful opportunity to present a complete defense.  Considering the instructions and trial record as a whole, we conclude that the trial court's instruction on eyewitness identification did not violate Banks's due process rights.

In *Lemcke, supra*, 11 Cal.5th at page 646, the California Supreme Court considered whether codefendant Charles Rudd's due process rights were violated when the trial court gave an instruction modeled on a former version of CALCRIM No. 315.  The instruction included 15 separate factors that the jurors should consider when deciding whether an eyewitness identification is accurate, including a factor identical to the factor Banks challenges here—" 'How certain was the witness when he or she made an identification?' " (*Id*. at p. 646.)  At the time, the witness certainty factor was not optional, and the instruction did not include further explanation regarding the accuracy of witness certainty.

The *Lemke* court rejected Rudd's due process claim.  The court held that CALCRIM No. 315 did not lower the prosecution's burden of proof because the instruction was " 'superficially neutral' "and did not instruct that " 'certainty equals accuracy' "or direct the jury to presume that an identification is accurate where the witness expresses certainty.  (*Lemke, supra*, 11 Cal.5th at p. 657.)  The court observed that although

9

CALCRIM No. 315 might suggest a correlation between certainty and accuracy, Rudd was permitted to call an expert to explain the circumstances under which certainty and accuracy are correlated. (*Ibid*.) Additionally, the court provided additional instructions directing the jury to consider expert testimony, advising the jury that the burden was on the prosecution to prove Rudd's guilt beyond a reasonable doubt, and advising the jury that sometimes witnesses make honest mistakes. (*Ibid*.) The Supreme Court held that, "[w]hen considered in the context of the trial record as a whole," the instruction did not " 'lower[] the prosecution's burden of proof" by causing jurors to 'equat[e] certainty with accuracy, when science establishes otherwise' . . . [or] den[y] [Rudd] 'a "meaningful opportunity to present a complete defense" ' " as to 'why the identification was flawed[,]' " in violation of Rudd's right to due process. (*Id*. at pp. 646, 657.)

Although the Supreme Court rejected the defendant's due process claim in *Lemke*, *supra*, 11 Cal.5th 644, the court acknowledged that CALCRIM No. 315 could potentially mislead jurors regarding the correlation between confidence and accuracy and "raises particular concerns in a case like [*Lemke*], where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant." (*Id*. at p 666.) The *Lemke* court referred the problem of whether and how to modify CALCRIM No. 315 to the Judicial Council and its Advisory Committee on Criminal Jury Instructions. (*Id*. at p. 668.) The court directed trial courts to omit the witness certainty factor pending further consideration of CALCRIM No. 315, except in the trial courts' discretion upon the defendant's request. (*Id*. at p. 669.)

Subsequently, the Advisory Committee on Criminal Jury Instructions revised CALCRIM No. 315 to place the witness certainty factor in brackets, and added the bracketed language that advises the jury that certainty does not always correlate with accuracy and lists the additional factors the jury should consider, as set forth *ante*.

## Analysis

" 'The touchstone of due process is fundamental fairness.' [Citations].  A jury instruction may ' "so infuse[ ] the trial with unfairness as to deny due process of law." '  [Citation.]  However, " 'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' " ' [Citation.]   ' "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." ' [Citations.]  ' "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*Lemcke*, *supra*, 11 Cal.5th at p. 655.)

The language of CALCRIM No. 315 in Banks's case was identical to that in *Lemke*, and thus neutral on its face. (*Lemke*, *supra*, 11 Cal.5th at p. 657.)  Moreover, Banks was not denied the opportunity to present a complete defense.  There is no indication that Banks was prevented from presenting expert testimony on

witness identifications, and Banks does not claim that counsel was ineffective for failing to call an expert witness.

Additionally, here, the trial court instructed that the jurors alone must judge the credibility or believability of witnesses (CALCRIM No. 226); that the prosecution bore the burden of proving Banks's guilt beyond a reasonable doubt, both as a separate instruction (CALCRIM No. 220) and within CALCRIM No. 315; and that Banks must be presumed innocent  (CALCRIM No. 220).

Finally, as in *Lemke*, witness certainty was one of many factors for the jury to consider—in Banks's case, CALCRIM No. 315 listed 13 other factors relevant to the accuracy of an identification.  Considering the instructions and trial record as a whole, the trial court's omission of the bracketed language further explaining the accuracy of certainty in eyewitness identification did not violate Banks's due process rights.  Bank's claim cannot be excepted from forfeiture on this basis.

We are not persuaded by Banks's argument that the facts of his case are more compelling than those in *Lemke*, such that they rise to the level of a due process violation.  Indeed, the contrary is true.  In *Lemke*, a single witness identified the defendant, and professed absolute certainty in her identification, stating:  " 'for sure it was [him]' " (*id*. at p. 649), and "it was ' "impossible . . . not to recognize his face" ' " (*id*. at p. 650).  The witness had only observed the defendant once in a situation of high stress—she saw him for a moment before he beat her unconscious.  There was no video or other evidence from which the defendant could be identified in *Lemke*.

In this case, two witnesses consistently identified the robber as the same person who attempted to exchange the $5

bill—G.R. and E.G. G.R. identified the robber as the person who tried to exchange the $5 bill to the 911 operator in a recorded call that occurred immediately after the robbery. At trial, the parties stipulated that Banks was the person who tried to exchange the bill. Additionally, there was copious evidence from surveillance cameras that recorded the exchange over the $5 bill, the robbery, and the path that Banks took to and from the McDonald's before and after each incident that permitted the jurors to independently evaluate whether Banks was the robber based on their personal observations of his gait, clothing, and mannerisms. Banks was arrested with a sweatshirt that had stitching like the one the robber was wearing in the video, a $100 counterfeit bill, and a black mask.

Moreover, neither of the eyewitnesses was asked to quantify her certainty in her identification at trial, and neither specifically expressed that she had complete confidence in her identification. Rather, both witnesses testified to the circumstances surrounding their identifications of Banks as the robber—the robbery occurred in the middle of the day; the witnesses had prior contact with Banks only 20 minutes earlier when he was discussing the $5 bill with G.R. for approximately seven minutes; G.R. observed Banks from a very short distance and could see his features clearly; the witnesses heard Banks's voice; and E.G. observed Banks's clothing. At the time that the witnesses first encountered Banks it was not a high stress situation—there was no crime taking place.

Here, the circumstances of the identifications were factors to be considered separately from witness certainty under the

13

instructions to the jury.[6] The circumstances were not *expressions* or *professions* of certainty that implicate the concerns discussed in *Lemke*. As the *Lemke* court observed, there are circumstances under which a witnesses' certainty does correlate with accuracy— notably when the event and the identification occur in close proximity, as happened here. (*Lemcke, supra*, 11 Cal.5th at p. 667.) The facts of Banks's case do not raise the same concerns as the facts in *Lemke*, which themselves did not rise to the level of a due process violation.

### *Ineffective Assistance of Counsel*

Banks contends that, even if his substantial rights were not affected, his challenge to the omissions from CALCRIM No. 315 is not forfeited because counsel provided ineffective assistance by failing to object. We reject this contention as well because Banks has failed to demonstrate prejudice.

---

[6] In addition to witness certainty, the jurors were instructed to consider 13 other factors, including:

"Did the witness know or have contact with the defendant before the event?

"How well could the witness see the perpetrator?

"What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, duration of observation?

"[¶] . . . [¶]

"How much time passed between the event and the time when the witness identified the defendant?

"[¶] . . . [¶]

"Did the witness ever fail to identify the defendant?

"Did the witness ever change his or her mind about the identification?"

To prevail on an ineffective assistance of counsel claim, appellant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. [Citation.] . . . [P]rejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

Banks argues that under the circumstances presented in the robbery the witnesses' identifications were likely flawed, and it is reasonably probable that the jury would not have convicted him if it had been instructed that a witness's certainty is not necessarily a good predictor of accuracy and provided with additional factors to aid it in judging the witness's identification. Specifically, Banks argues that the following facts undermine the accuracy of the identification: the robber wore a hoodie and was masked, the interaction lasted less than a minute, the robbery occurred in a busy restaurant, and the witnesses were under stress when they observed the robber.

Despite these facts, on this record we cannot conclude that it is reasonably probable the jury would have returned a more favorable verdict if the additional factors affecting witness certainty had been included in CALCRIM No. 315. The same circumstances we discussed when assessing whether the instructional error could rise to the level of a due process violation foreclose the possibility of prejudicial error as a result of ineffective assistance of counsel. (See *People v. Bolin, supra*, 18 Cal.4th at p. 333 [to demonstrate ineffective assistance of counsel record must demonstrate " 'a reasonable probability that, but for

15

counsel's unprofessional errors, the result of the proceeding would have been different' "]; *People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2 ["substantial rights are affected if . . . it [is] reasonably probable defendant would have obtained a more favorable result in the absence of error"].)

## DISPOSITION

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.


MOOR, J.


We concur:


BAKER, Acting, P. J.


KIM, J.